**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL THOMAS, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No.: |
| McDONALD'S USA, LLC, a Delaware limited liability company, and McDONALD'S CORPORATION, a Delaware corporation, | Jury Trial Demanded |
| Defendants. | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

*Page*

NATURE OF THE ACTION ........ 2
THE PARTIES ........ 5
JURISDICTION AND VENUE ........ 6
FACTS COMMON TO ALL COUNTS ........ 8
A. McDonald's and Franchisees Are Independent Operators of Restaurants That Compete With Each Other and Purportedly Set Their Own Menu Prices ........ 8
B. McDonald's Becomes the Price-Setter ........ 12
C. McDonald's Scheme Causes Harm ........ 17
D. An $18 Burger Brings McDonald's Price-Fixing to Light ........ 18
CLASS ALLEGATIONS ........ 20
CLAIMS FOR RELIEF ........ 23
COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT ........ 23
COUNT II: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 .. 24
COUNT III: VIOLATIONS OF THE ILLINOIS ANTITRUST ACT, ........ 25
COUNT IV: VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ........ 26
PRAYER FOR RELIEF ........ 28
JURY DEMAND ........ 30

Plaintiff Michael Thomas, on behalf of himself and all others similarly situated, with knowledge as to his own actions and events, and upon information and belief as to other matters based on the investigation of counsel and other public information, complains and alleges as follows:

## NATURE OF THE ACTION

1. For years, Americans have paid more for nearly everything. Groceries, gas, food, and rent have outpaced paychecks, and consumers have cut back where they can just to cover the basics. At the same time, they have become raw material for a different kind of extraction. Tech platforms and large corporations mine their data—like where they live and how much money they might make—and feed it into algorithms built to find the highest price each customer will bear.

2. Companies call this "optimization." For consumers, it means paying more because a machine has calculated that they probably can.

3. This case is about McDonald's bringing "optimization" to America's largest fast-food chain. McDonald's has built and for years deployed its own information-sharing pricing platform, which draws on data from its millions of daily transactions to set menu prices across thousands of U.S. restaurants. The result is algorithmic price-fixing aimed at customers who are already stretched thin.

4. Importantly, "McDonald's" is not just a single operator of those thousands of restaurant outlets, free to set pricing at all restaurants as it chooses. Instead, McDonald's restaurants in the United States are overwhelmingly owned by independent franchisees: Approximately 95 percent of the 14,000 or so McDonald's restaurants in the U.S. are independently owned and operated. These franchisees are individuals or separate legal entities not owned by McDonald's Corporation or McDonald's USA, LLC. As independent operators, these

entities purportedly set their own prices and, by design, compete with one another for the same customers, often in the same geographic area.

5. Independent businesses must set their prices independently. But since at least 2019, McDonald's has replaced that independent pricing mandate with a coercive price-fixing agreement deployed across its corporate and franchised stores to collect all stores' nonpublic pricing data, feed it into an algorithm, and alter menu prices accordingly. The McDonald's independent franchisees that stray from the shared pricing tool face losing the significant investments they have made in their restaurants.

6. This action challenges under the Sherman Act and other laws a price-fixing contract, combination, or conspiracy between and among Defendants McDonald's USA, LLC, McDonald's Corporation (together, "Defendants" or "McDonald's"), and their franchisees pursuant to which McDonald's and franchisees knowingly agreed to share competitive nonpublic pricing data; set prices using algorithms that trained on this nonpublic data; tie price hikes to the actions of competing franchisees; and allow the franchisor to monitor compliance.

7. Since at least 2019, McDonald's has owned and operated a centralized, machine-learning "pricing engine" that ingests data from millions of daily transactions across corporate and franchised McDonald's restaurants, including the confidential sales data of franchisees, and generates a recommended price for menu items at individual restaurants.

8. The engine, according to recent public reporting, does not just recommend prices that cover costs. It estimates how much each restaurant's likely customers are willing to pay and tells each franchisee how sensitive its likely customers are to prices using competing the nonpublic data of competing McDonald's to do so. The algorithm is programmed with rules tying one

restaurant's price increases to whether other McDonald's restaurants have already raised prices on the same item.

9. McDonald's has, in various ways, heavily pressured franchisees to use the algorithm to price menu items. McDonald's has significant leverage over its franchisees, who make sizable investments in their restaurants and stand to lose those investments if they do not remain in the good graces of the franchisor. Franchisees' authorization to continue operating their stores, expand the number of stores they operate, and ultimately renew their stores at the expiration of the franchise agreement is dependent on their level of compliance with McDonald's-mandated business policies, practices, and procedures.

10. Prior to January 2026, according to public reporting, McDonald's heavily pressured franchisees to adopt its algorithmic pricing tools. After that date, in January 2026, McDonald's has required its franchisees to use the company's approved pricing consultant and tools. To enforce this agreement, McDonald's tracks franchisee deviations from the engine's recommendations in detail, follows up with franchisees who do not use it, and tells its investors that "pricing non-compliance" factors into the company's decision about whether franchisees may be considered for renewal or expansion of their franchises.

11. McDonald's algorithmic pricing tool is important to McDonald's because McDonald's earns money in its own corporate-operated stores and also earns royalty income based on revenues generated by the independent franchisees nationwide. "Optimized" pricing across thousands of restaurants leads to increased income for McDonald's.

12. The tool also has been effective. McDonald's May 29, 2024 fact sheet states that average menu prices rose approximately 40 percent between 2019 and 2024, and the company's fiscal year 2022 and 2023 10-Ks credit as a driver the company's "strategic menu price increases."

13. Franchisees are aware that other franchisees, *i.e.* their competitors, are using the same system and accessing the same algorithmic tools trained on their shared nonpublic data.

14. The system itself, according to public reporting, warns in the pricing portal's terms of service that fellow users may be competitors of each other and must comply with the antitrust laws. Instead, McDonald's and its franchisees have together colluded to fix prices for consumers. This is an unreasonable restraint of trade and serves no legitimate procompetitive objective.

15. As a result of this system, consumers have paid on average higher prices over time and have paid anticompetitive prices during the class period. Plaintiffs and the Class members paid more for McDonald's food than they would have paid in a market in which true competition prevailed and franchisees set their prices independently. They bring this action for treble damages, injunctive relief, and attorneys' fees.

## THE PARTIES

16. Plaintiff Michael Thomas is a resident of Dekalb, Illinois. He is and during the relevant period has been a regular purchaser of menu items from multiple McDonald's restaurants, where he has paid varying prices for the same items at varying times.

17. Plaintiff has suffered injury by paying supracompetitive prices for McDonald's menu items set not by legitimate competition but instead by McDonald's and franchisees' algorithmic price-fixing tool based on the sharing of non-public price and sales data exchanged between competitors.

18. Defendant McDonald's USA, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is a wholly-owned subsidiary of its parent and predecessor, McDonald's Corporation, which is a Delaware corporation with its principal place of business in Chicago, Illinois. McDonald's is in the business of selling food to customers primarily

through independently owned and operated franchise restaurants. It has multiple McDonald's franchise restaurants in Illinois and in every state in the United States. During the period of interest in this lawsuit, it has owned and operated multiple company-owned McDonald's restaurants in Illinois and in approximately 35 other U.S. states and territories.

## CO-CONSIPRATORS

19. Various other corporations and persons not made defendants in this Complaint, including McDonald's franchisees and the McDonald's operating companies that operate company-owned restaurants, participated as coconspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged. Defendants' agents, including their vendors, officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' business or affairs. Defendants are jointly and severally liable for the acts of their coconspirators, whether named or not named as defendants in this Complaint.

## JURISDICTION AND VENUE

20. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1332 and 1337 to prevent and restrain the Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

21. Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(2), (c)(2). McDonald's transacts or has transacted business in this district and has its principal place of business here. Based on information and belief, a substantial part of the events that gave rise to this action occurred here—namely, the decision to implement the price-fixing strategy and coerce franchisees into participating. McDonald's standard franchise agreement states that the provisions and terms of the agreement are to be interpreted in accordance with and governed by the laws of the state of Illinois. It specifies that all notices are to be directed and delivered to McDonald's address at its principal place of business in this district.

22. McDonald's is in the business of selling food to consumers primarily through independently owned and operated franchise restaurants. These restaurants are in each state in the United States, and McDonald's has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner or owners of the franchise.

23. McDonald's also sells food to consumers through its own company-owned stores. These restaurants are owned by McDonald's Operating Companies ("McOpCos"), which are indirect or direct subsidiaries of Defendant McDonald's Corporation. During the period of interest in this lawsuit, more than 35 U.S. states and territories, including Illinois, have boasted multiple McOpCo McDonald's restaurants. Hundreds of McOpCo McDonald's restaurants have operated in the U.S. every year during the relevant period. McDonald's owns, operates, and engages in substantial business activities through the McOpCo restaurants.

24. McDonald's engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTS COMMON TO ALL COUNTS

### A. McDonald's and Franchisees Are Independent Operators of Restaurants That Compete With Each Other and Purportedly Set Their Own Menu Prices

25. McDonald's is one of the world's largest restaurant chains, serving approximately 69 million customers daily in more than 100 countries across approximately 45,356 outlets. McDonald's primarily sells hamburgers, cheeseburgers, chicken products, French fries, breakfast items, soft drinks, milkshakes, wraps, and desserts.

26. A McDonald's restaurant is operated by either a franchisee or, in the case of company-operated stores, as a McOpCo. McDonald's revenues come from the rent, royalties, and fees paid by the franchisees, as well as from sales in the McOpCo restaurants. McDonald's receives a 4-5% royalty service fee from its franchisees based on their revenues, in addition to franchisees' mandatory advertising contributions, which also are tied to franchisee revenues. McDonald's also earns real estate rent monies from franchisees.

27. Currently, McDonald's has franchised approximately 95 percent of its U.S. restaurants, while the remainder are owned and operated by the company. Most McDonald's franchisees are subject to a standard 20-year franchise license agreement.

28. Any existing McDonald's franchise agreement entered into (and not later amended or superseded) prior to approximately 2005 is an agreement in which McDonald's Corporation is the franchisor. Any existing McDonald's franchise agreement entered into since approximately 2005 is an agreement in which McDonald's USA, LLC is the franchisor.

29. Each franchise is operated by an entity that is a separate legal entity from McDonald's USA, LLC and McDonald's Corporation. Each franchise is an independently owned and independently managed business.

30. McDonald's license agreements and operator's lease agreement both provide that franchisees are independent of McDonald's and are responsible for all obligations and liabilities of their own business, and are responsible for the day-to-day operations of the business.

31. McDonald's consistently asserts that franchisees are independent businesses, neither owned nor operated by McDonald's itself, who are responsible for their own day-to-day operations.

32. The McDonald's standard franchise agreement itself contains a provision with the header "***Franchisee Not an Agent of McDonald's***" (emphasis in original), that characterizes franchisees as "independent contractor[s]." Pursuant to that provision, McDonald's and franchisees agree that, "Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose. … Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances."

33. McDonald's likewise consistently asserts that franchisees will face competition from each other, from McDonald's itself, and from other channels McDonald's may utilize. In McDonald's ownership and operation of the McOpCo company-owned restaurants, McDonald's acts as a competitor of independently-owned and -operated McDonald's franchisee restaurants.

34. Unlike other franchise business models, McDonald's does not permit its franchisees an exclusive geographic territory within which they will not face competition from other McDonald's restaurants, including McOpCo restaurants. The McDonald's Franchise Disclosure Document ("FDD") states at the outset that franchisees "should not have any expectation that the economic and demographic factors that exist at your McDonald's restaurant

location will remain constant. In addition, other McDonald's restaurants (including those that we develop in the future) may have an effect on the sales of your McDonald's restaurant, since customers typically patronize various McDonald's restaurants depending on their travel patterns and other factors."

35. Franchisees are informed and McDonald's discloses that franchisees may face competition from other franchisees, new franchisees, and new McDonald's restaurants owned and operated by McDonald's itself.

36. McDonald's FDD specifies that the Franchise Agreement "does not contain any exclusive grant, exclusive area, exclusive territorial rights, protected territory, or any right to exclude, control, or impose conditions on the location or development of future McDonald's restaurants at any time. You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

37. The franchise agreement specifies that McDonald's franchisees have no exclusive, protected, or territorial rights in the contiguous market area of their restaurant location(s). McDonald's standard franchise agreement specifies that the franchisee is authorized to use the McDonald's system (for a specified period of time) only at the particular restaurant specified therein.

38. As McDonald's told commissioners of the Federal Trade Commission in a 2023 public comment, this is deliberate: "Some franchisors vest franchisees with exclusive territorial rights; McDonald's does not. This incentivizes franchisees to maintain high-quality restaurants,

lest they lose business to other locations in their immediate vicinity."[1] That is, McDonald's restaurants compete with each other by design.

39. The FDD further stresses that the franchisee "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control[,]" and that "[t]he sales and customer trading patterns . . . . do not represent any continuing franchisee entitlement or expectation. McDonald's may establish other franchisee or … McOpCo company-owned outlets that may alter customer trading patterns and affect the sales of, and compete with, your location." The FDD notes that McDonald's reserves the right to use McDonald's trademarks and to sell similar goods and services through "any other channel of distribution."

40. Franchisees are permitted to negotiate purchasing terms with approved suppliers and to seek approval of new suppliers. They may also compete with each other by allowing customers to use certain credit and debit cards or certain gift cards, neither of which is a system-wide requirement.

41. McDonald's likewise states that it does not set franchisees' restaurant menu prices. For instance, McDonald's asserts in regulatory filings that it is "primarily a franchisor and believes franchising is paramount to delivering great-tasting food, locally relevant customer experience and driving profitability." It notes that "[f]ranchising enables an individual to … maintain control over

[1] Plaintiffs' Request for Pre-Motion Conference Re: Claim for Breach of Contract, Dkt. 91, Ex. 2, Oct. 24, 2024, Letter from McDonald's to FTC Chair Lina Khan and FTC Commissioners Rebecca Slaughter and Alvaro Bedoya Re: Public Comment on Provisions of Franchise Agreements and Franchisor Business Practices, *Michell et al. v. McDonald's Corp., et al.*, Case No. 1:24-cv-03442 (E.D.N.Y. Oct. 17, 2025).

all employment related matters, marketing and pricing decisions[.]" It further states that it develops pricing strategies "in collaboration with franchisees."[2]

42. McDonald's has repeatedly held out to the public that franchisees, not McDonald's, set their own menu prices. On May 29, 2024, McDonald's USA President Joe Erlinger wrote in an open letter that "[o]ur franchisees (who own and operate more than 95% of all restaurants in the U.S.) set menu prices for their restaurants."[3]

43. Menu pricing is not among McDonald's brand standards or its prescribed standards of Quality, Service, and Cleanliness with which franchisees contract to comply in entering into the franchise relationship.

44. More recently, at its September 23, 2026 Investor Day, Global CMO Morgan Flatley said that "[f]ranchisees retain control over independent pricing decisions."

45. But for the price-fixing agreement alleged herein, each McDonald's franchise (and McDonald's itself in its McOpCo stores) is its own economic decision-maker with respect to setting menu prices. But for the price-fixing agreement, each McDonald's franchise (and McDonald's itself) would compete with each other on the basis of menu pricing.

### B. <u>McDonald's Becomes the Price-Setter</u>

46. Notwithstanding its public contentions that franchisees maintain control over their own menu pricing decisions, McDonald's has taken steps to coordinate the sharing of nonpublic pricing information among horizontal competitor restaurants and to pressure franchisees to set prices in accordance with its algorithmic pricing tool.

---

[2] McDonald's Corporation From 10-Q dated March 31, 2026, available at https://www.sec.gov/Archives/edgar/data/63908/000006390826000051/mcd-20260331.htm? (last viewed Oct. 2, 2026).

[3] Open letter from Joe Erlinger, President of McDonald's USA, "Providing meaningful value to our fans, with a side of facts" (May 29, 2024) https://corporate.mcdonalds.com/corpmcd/our-stories/article/providing-meaningful-value-to-our-fans-with-a-side-of-facts.html

47. In 2019, McDonald's acquired the artificial intelligence company Dynamic Yield for $300 million. Its acquisition of the company, haled by Restaurant Dive as the "deal of the year," was described by then-CEO Steve Easterbook in an October earnings call as an opportunity to "leverage knowledge of the customer and order patterns to provide a tailored experience in restaurants."[4]

48. Known and unknown third parties, reportedly including Deloitte and Tiger Analytics, assisted McDonald's in designing and implementing use of the McDonald's AI platform for gathering transaction data and recommend coordinated pricing across franchises and McOpCo restaurants. This pooled transaction data is nationwide in scope and purportedly accounts for consumers' willingness to pay.

49. Upon information and belief and according to a Reuters article published on Sept. 29, 2026, McDonald's controls and directs the pricing tool. Sources told Reuters that Tiger Analytics runs the pricing tool, which McDonald's controls[5]. The reporting, based on numerous sources, supports that McDonald's applies heavy pressure to get franchisees to set prices in accordance with the tool, and uses as leverage its ability to decide not to renew a franchise agreement.

50. The most recent McDonald's Franchise Disclosure Document (FDD) requires franchisees to pool their data using a required and proprietary point-of-sale system owned by McDonald's: "The restaurant's transaction-level information generated by the POS, including sales, transactions, and product mix information, is stored on your server hardware and transmitted to McDonald's and held on its servers. McDonald's has independent access to this information

[4] Julie Littman, "Deal of the Year: McDonald's Acquires Dynamic Yield," Restaurant Dive (Dec. 9, 2019), https://www.restaurantdive.com/news/deal-mcdonalds-acquires-dynamic-yield-restaurant-dive-awards/566467/.
[5] Waylor Cunningham, "Inside McDonald's Push to Have AI Price Your Bag" Reuters (Sept. 29, 2026) https://www.reuters.com/business/inside-mcdonalds-push-have-ai-price-your-big-mac-2026-09-29/

and there are no contractual limits on its right to access such information." Franchisees must pay to use this required system.

51. This point-of-sale (POS) system, according to its Franchise Disclosure Document, is part of a McDonald's requirement every new restaurant to use its Technology Platform. Each restaurant's "transaction-level information generated by the POS, including sales, transactions, and product mix information, is … transmitted to McDonald's," and "McDonald's has independent access to this information and there are no contractual limits on its right to access such information." The same is true of mobile app orders. Franchisees also submit monthly restaurant profit and loss statements. Franchisees may not disclose their sales data to anyone else without the approval of McDonald's. In other words, McDonald's is the only channel through which one franchisee's data can inform a rival's price.

52. The FDD also advises franchisees of an annual fee for use of its "Pricing Engine." McDonald's lists the fee as optional, but in fact, franchises are expected to use it.

53. McDonald's has publicly admitted to using the tool to set pricing. In an investor presentation on September 23, 2026, McDonald's exec Morgan Flattley described the "menu pricing engine" as an "industry-leading tool" providing franchises with "pricing recommendations down to the restaurant and item level" "[i]nformed by insights from millions of transactions and a broad range of market data."

54. At the same event, McDonald's exec Brian Rice described the tool as "only as good as the data feeding it." McDonald's, he continued, has "built a standard restaurant data lake" capturing "billions of data points daily": "This creates an insurmountable advantage and a continuous learning loop that competitors can't replicate."

55. According to Reuters' reporting, the pricing tool specifically focuses on recommending increases on menu items that have not had a price increase in at least two years; increasing prices on items that have had recent price increases in at least 30 percent of stores (the "30% rule"); and excluding ice creams and drinks from price increases during summer months. McDonald's controlled the engine's rules and corporate targets, including the 30% rule.

56. In other words, under the 30% rule, whether a franchisee is told to raise a price depends on whether its competitors already did.

57. McDonald's claims its franchisees determine final pricing. But franchisees follow McDonald's recommendations. According to public reporting by Reuters, adherence is reportedly tracked, fed into internal reviews, and used to determine whether to renew (or expand) a franchisee's license agreement with the company. In addition, McOpCos comply with the pricing tool and use nonpublic franchisee data to determine and set prices at corporate restaurants—while competing with these same franchisee restaurants.

58. According to public reporting by Reuters, the McDonald's pricing tool measures "customer willingness to pay in your area" and gives franchisees warnings if their prices are too low—noting, for example, "Your restaurant is showing MEDIUM SENSITIVITY to Price."

59. The portal's terms warn that users "may be competitors of each other" and must comply with antitrust law, Reuters reports. Former FTC Commissioner William Kovacic told Reuters that this disclaimer was "an acknowledgment there's a potential problem."

60. Franchisees rely on McDonald's for renewal of their franchise agreement and for any desired business growth. The agreement states that franchisees "have no right to renew or extend" the franchise agreement. In order to even be eligible to renew or grow their business with McDonald's, franchisees must minimally meet McDonald's National Franchising Standards as

assessed by McDonald's at periodic business reviews. Franchise Disclosure Document, Ex. K (2026).

61. McDonald's thus exercises significant leverage over its franchisees. Franchisees must strictly adhere to "McDonald's standards and policies as they exist now and as they may be from time to time modified," and "comply with all business policies, practices, and procedures imposed by McDonald's." Franchise Disclosure Agreement, Ex. B. If McDonald's decides that its standards are breached, McDonald's can terminate the parties' franchise agreement. *Id.* Franchisees invest considerable sums in the startup and operation of their restaurants, including a $45,000 initial franchise fee and further initial investments estimated by McDonald's totaling up to or in excess of $1,000,000.

62. McDonald's used this pressure to get franchisees to adopt its pricing tool. According to Reuters, several franchisees were pushed to use the pricing tool and received calls from McDonald's when their menu pricing deviated from what was recommended. In February 2024, the McDonald's executive Jeff Roth allegedly faulted franchisee George Michell for "not utilizing industry-standard advisors when setting his retail prices." *Michell et al. v. McDonald's Corp. et al.*, First Amended Compl., ¶140 Dkt. 55 (E.D.N.Y. Nov. 11, 2024).

63. As of January 2026, McDonald's "holistically assess[es]" franchisees' menu pricing. Under this assessment, franchisees are required to be "constructively engaging with McDonald's approved Pricing Consultant and Tools."[6]

64. According to Reuters, McDonald's explicitly and in detail "records franchisees' deviations from the recommendations."

---

[6] Amelia Lucas, "McDonald's will assess if franchisees are offering value for customers under new standards" CNBC (Dec. 8, 2025) https://www.cnbc.com/2025/12/08/mcdonalds-value-franchising-standards.html; Waylor Cunningham, "Inside McDonald's Push to Have AI Price Your Bag" Reuters (Sept. 29, 2026) https://www.reuters.com/business/inside-mcdonalds-push-have-ai-price-your-big-mac-2026-09-29/

65. In an August 4, 2026 earnings call with investors, CEO Chris Kempczinski implied that the company would have conversations during its business reviews and in renewal and growth conversations with franchisees who deviate from recommended pricing. It's "kind of obvious what should happen out of that," he said, noting that those conversations "will be the things that get this fixed."[7]

### C. The McDonald's Scheme Causes Harm

66. The McDonald's price-fixing scheme resulted in raised prices for consumers at McDonald's restaurants.

67. These coordinated decisions to raise prices are based on pooled nonpublic data used anticompetitively to increase revenues over time.

68. In a September 23, 2026 investor presentation, McDonald's CEO Chris Kempczinski described "deploying AI enabled tools at scale" as a means to "strengthen restaurant economics and unlock restaurant level efficiency."[8]

69. The company's May 29, 2024 fact sheet states that average menu prices rose approximately 40 percent between 2019 and 2024, aligning with the time period during which McDonald's deployed the pricing tool. McDonald's told consumers that the price increase was attributable to costs.[9]

70. In fiscal year 2019, according to its 10-K filing that year, McDonald's sales were up 5 percent while guest counts fell 1.9 percent.[10]

---

[7] Transcript of McDonald's Corp. R (MDO0.F) Q2 FY2026 Earnings Call, Yahoo! Finance (Aug. 4, 2026), https://finance.yahoo.com/quote/MDO0.F/earnings/MDO0.F-Q2-2026-earnings_call-662377.html.
[8] Investor Day 2026 (Sept. 24, 2026) https://www.youtube.com/watch?v=3p0Ur4Pzer8
[9] U.S. Pricing: Myths v. Facts, McDonald's (May 29, 2024), available at https://corporate.mcdonalds.com/content/dam/sites/corp/nfl/pdf/McDUS%20Pricing%20Myths%20vs%20Facts%20052924.pdf
[10] McDonald's 2019 Corporation From 10-K dated February 26, 2020, available at https://www.sec.gov/Archives/edgar/data/63908/000006390820000022/mcd-12312019x10k.htm

71. That menu pricing contributed to a jump in profits for McDonald's is confirmed in the company's fiscal year 2022 and 2023 10-Ks, which both credit as a driver of profits the company's "strategic menu price increases."[11]

72. Even where McDonald's strategic menu pricing resulted in lower prices, the overall aim was to increase Defendants' profits and advantage in the marketplace by leveraging independent restaurants' nonpublic sales data across competitors within its system.

73. For example, in the August 4, 2026 earnings call, CEO Chris Kempczinski noted that "with those folks that are not complying" with pricing, "as you would imagine, their business results are a lot softer ... It starts with an education piece to show when you execute the program as designed, here's what that performance looks like compared to those who didn't. There's quite a difference, let's just say, between the two of those."[12]

74. Similarly, in the September 23, 2026 Investor Day presentation, McDonald's CFO Ian Borden told investors that "capabilities such as AI-enabled revenue management" would "help increase average check over time."[13]

**D. <u>An $18 Burger Brings McDonald's Price-Fixing to Light</u>**

75. In July 2023, a social media post went viral after a consumer, shocked by the pricing, posted a McDonald's menu featuring an $18 Big Mac meal at a Darien, Connecticut McDonald's.[14]

---

[11] McDonald's 2022 Corporation From 10-K dated February 24, 2023, available at https://www.sec.gov/Archives/edgar/data/63908/000006390823000012/mcd-20221231.htm; McDonald's 2023 Corporation From 10-K dated February 22, 2024, available at https://www.sec.gov/Archives/edgar/data/63908/000006390824000072/mcd-20231231.htm

[12] Yahoo Finance, "McDonald's Corporation (MCD) Q2 FY2026 earnings call transcript" (Aug. 4, 2026) https://finance.yahoo.com/quote/MCD/earnings/MCD-Q2-2026-earnings_call-662377.html

[13] Investor Day 2026 (Sept. 24, 2026) https://www.youtube.com/watch?v=3p0Ur4Pzer8

[14] Shannon Thaler and Ariel Zilber, Connecticut McDonald's branch slammed for charging $18 for a Big Mac meal, New York Post (July 19, 2023), https://nypost.com/2023/07/19/mcdonalds-branch-slammed-for-charging-18-for-a-big-mac-meal/.

76. In a complaint first filed in the United States District Court for the Eastern District of New York on May 9, 2024, the Darien franchisee, George Michell, alleged that the $18 Big Mac meal's pricing was recommended by "industry standard advisors"[15]—a reference, upon information and belief, to the company's pricing tool.

77. McDonald's took affirmative steps to insist that higher pricing at McDonald's restaurants were not due to use of a pricing tool.

78. After Michell filed his lawsuit, McDonald's USA President Joe Erlinger stated in an open letter to consumers that the $18 meal was the exception, not the rule; attributed the rise in prices at McDonald's restaurants to inflation; and directly stated that its franchisees "set menu prices for their restaurants."[16]

79. McDonald's use of the tool to set pricing was not widely known until Reuters published an article explaining it on September 29, 2026.

80. As the United States' Department of Justice recently noted in a filing in this court, "any formula used to fix benchmark, component, recommended, or 'starting point' prices—even if end prices ultimately vary" can violate the Sherman Act. Statement of Interest of the United States, *In re Multiplan Health Insurance Prov. Litig.*, Case No. 1:24-cv-06795, Dkt. 380-01 (N.D. IL. March 26, 2025).

81. In the same statement, DOJ further noted that "sharing information through an algorithm provider can create the same anticompetitive effects as a direct exchange between competitors because the algorithm provider 'has confidential price strategy information from

[15] Complaint, *Michell et al. v. McDonald's Corp., et al.*, Case No. 1:24-cv-03442, Dkt. 1 (E.D.N.Y. May 9, 2024).
[16] Open letter from Joe Erlinger, President of McDonald's USA, "Providing meaningful value to our fans, with a side of facts" (May 29, 2024), https://corporate.mcdonalds.com/corpmcd/our-stories/article/providing-meaningful-value-to-our-fans-with-a-side-of-facts.html.

multiple competitors.'" *Id.* (citing *Duffy v. Yardi Sys., Inc.*, 2024 WL 4980771, at *5 (W.D. Wash. Dec. 4, 2024)).

**PLAINTIFF MICHAEL THOMAS**

82. Plaintiff Michael Thomas is a resident of Dekalb, Illinois.

83. Throughout the class period, Plaintiff Thomas has paid differing prices for menu items at McDonald's stores near his home.

84. Upon information and belief, Plaintiff Thomas has suffered harm due to McDonald's supracompetitive pricing, which charges him more for the same item depending on which McDonald's he goes to. Specifically, because he works hard to be price-conscious and is a frequent McDonald's consumer, Plaintiff Thomas has noticed prices differing from store to store near his home.

85. Plaintiff Thomas typically orders a Quarter Pounder with cheese, along with fries and a Coke, or sometimes goes to McDonald's with his wife for breakfast on Sunday mornings. He has paid different pricing for the same menu items at stores in close proximity and has suffered antitrust injury by paying supracompetitive prices for menu items at McDonald's restaurants due to McDonald's algorithmic price-fixing tool.

**CLASS ALLEGATIONS**

86. Plaintiff brings this action on his own behalf, and on behalf of the following class and subclass.

87. Nationwide Class: Plaintiff initially defines a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3), as follows:

> All persons in the United States who purchased menu items at all McDonald's restaurants whether operated by McDonald's itself or by a McDonald's Franchisee.

88. Illinois Subclass: Plaintiff initially defines an Illinois subclass as follows:

> All residents of Illinois who purchased menu items at all McDonald's restaurants in Illinois, whether operated by McDonald's itself or by a McDonald's Franchisee.

89. The Class, subclass, and their members shall be referred to herein as the "Class" or "Class Members." Excluded from the Class are Defendant McDonald's, its affiliates, officers and directors, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definition, or to propose Subclasses, on discovery and further investigation.

90. Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are approximately 14,000 McDonald's restaurants in the United States. While the exact number and identities of the individual Members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that there are millions of Class Members.

91. Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all Members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

a. Defendants engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

b. Defendants' conduct constituted unfair competition;

c. Defendants' conduct constituted unlawful, unfair, and fraudulent business acts and practices;

d. Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.*;

e. Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

f. Plaintiff and Class Members are entitled to damages, restitution, equitable relief, and/or other relief; and

g. The amount and nature of such relief to be awarded to Plaintiff and the Class.

92. Typicality: All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff paid for food priced in a manner affected by the nonpublic competitive data pooling and pricing of independently-owned and -operated restaurants by McDonald's, and each Member of the Class also did so. Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to anticompetitive collusion, data pooling, and pricing, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendants for themselves and all absent Class Members.

93. Adequacy: Plaintiff is an adequate representatives because her interests do not conflict with the interest of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

94. Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the Members of the Class could afford such individual

litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, Members of the Class can be readily identified and notified based on, inter alia, advertising and Defendants' records.

95. Defendants have acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1, *et seq.* (By Plaintiff on Behalf of the Nationwide Class)

96. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

97. Beginning no later than 2019 and continuing to the present, Defendants and their coconspirators entered into a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at McDonald's restaurants in the United States by agreeing to price through a common algorithm using pooled competitor data and to adhere to its outputs.

98. The agreement among horizontal competitors, orchestrated by McDonald's, is unlawful *per se*. Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

99. As a direct and proximate result, Plaintiffs and Class members paid supracompetitive prices and were injured.

100. Plaintiffs and Class members are entitled to treble damages, costs, and attorneys' fees under 15 U.S.C. § 15, and to injunctive relief under 15 U.S.C. § 26.

101. In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

102. The anticompetitive effects of Defendants' agreements, including higher prices and suppressed price competition among independently-owned and -operated McDonald's restaurants, are obvious and demonstrated directly and through Defendants' market power in the relevant markets.

103. Defendants' conduct is not reasonably necessary to any legitimate procompetitive justification. Even if it were, any procompetitive justification could be achieved through substantially less restrictive means, including pricing tools that do not pool franchisees' confidential data, do not condition price increases on other stores' increases, and do not tie compliance to franchise standing.

104. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiffs and Class members were injured and are entitled to relief as alleged in Count I.

**COUNT II: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(Unlawful Exchange of Competitively Sensitive Information)**
**(By Plaintiff on Behalf of the Class)**

105. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

106. Defendants agreed to and did exchange, through the pricing engine, franchisees' current, granular, nonpublic sales and pricing information, and to use that information to generate each franchisee's prices.

107. This data exchange was not a freestanding sharing of nonpublic information, but the mechanism through which Defendants and their co-conspirators fixed prices. Each participant contributed its current, granular, nonpublic, store- and item-level sales and pricing data to a common engine. Each did so knowing that its direct competitors—other franchisees and McOpCos—were contributing their data to the same engine and receiving prices generated from the pooled data. Each agreed to use the engine's outputs to set its own prices rather than pricing independently. The engine applied rules, such as the 30% rule, that conditioned one restaurant's price increases on increases at competing restaurants. The exchange was therefore an agreement among horizontal competitors to fix, raise, and stabilize prices, and it is unlawful *per se*.

108. Because the restraint is unlawful *per se*, Plaintiff need not define a relevant market or allege market power.

109. Plaintiffs and Class members were injured and are entitled to relief as alleged in Count I.

**COUNT III: VIOLATIONS OF THE ILLINOIS ANTITRUST ACT, 740 ILCS 10/1, *ET SEQ.***
**(By Plaintiff on Behalf of the Illinois Subclass Against All Defendants)**

110. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

111. Defendants engaged in unlawful contracts, combinations, and/or conspiracies in restraint, trade or commerce in violation of Illinois Antitrust Act, 740 ILCS 10/1, *et seq*.

112. As alleged above, Defendants engaged in predatory and anticompetitive behavior to pool nonpublic pricing data across competitors and used that data to charge supracompetitive prices and to gain market share.

113. Defendants' specific intent has been to leverage its sizable number of stores and its massive amounts of nonpublic data to lessen competition in the marketplace in order to increase its market share and its profits.

114. A substantial amount of trade and commerce in the United States and in the state of Illinois has been affected and will continue to be affected in the market for McDonald's menu items as a result of Defendants' unreasonable anticompetitive behavior alleged above.

115. A substantial portion of the Defendants' behavior concerning the allegations above occurred in the state of Illinois.

116. As alleged above, Defendants' contract, combination, and/or conspiracy constitutes unreasonable restraints on trade and commerce, all of which are per se violations of the Illinois Antitrust Act, 740 ILCS 10/3, *et seq.*, or in the alternative, violations under the rule of reason.

117. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

118. Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Illinois Antitrust Act alleged herein.

**COUNT IV: VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS 505/1, *ET SEQ.***
**(By Plaintiff on Behalf of the Illinois Subclass Against All Defendants)**

119. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120. Section 2 of ICFA prohibits unfair or deceptive acts or practices and states, in relevant part, as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

121. Defendants violated Section 2 of ICFA by engaging in unfair acts in the course of conduct involving trade or commerce when dealing with Plaintiff and the Class.

122. Specifically, it was an unfair act and practice for Defendants, on behalf of and in cooperation with its subsidiaries and franchises, to use supracompetitive data-pooling using consumer data and the McDonald's pricing tool to set menu prices.

123. Despite representing to the public that its stores were competitors engaged in independent price-setting, Defendants nonetheless failed to fulfill such representations by pooling all transaction data, setting prices according to this nonpublic data, and requiring franchisees to rely on this data in setting menu prices.

124. Defendants' conduct, individually and in concert as alleged above and herein, is immoral, unethical, oppressive, unjust, unconscionable, and unscrupulous, and caused and continues to cause substantial economic injury to Plaintiff and the Class.

125. Defendants' conduct is driven by greed, profiteering, and conspiracy to fix prices using nonpublic data to the detriment of Plaintiff and the Class as alleged herein.

126. Defendants intended that Plaintiff and the Class rely on material misrepresentations, deceptions, unfair practices, and/or omissions alleged herein.

127. As a result of Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Defendants has unjustly enriched itself at the expense of Plaintiff and the Classes. The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

128. The conduct is unfair, unlawful, or unconscionable under Illinois law.

129. To prevent their unjust enrichment, Defendants and its co-conspirators should be required to disgorge their illegal gains for the purpose of making full restitution to all injured Class Members identified hereinabove.

130. Defendants should also be permanently enjoined from continuing its violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.

131. A substantial portion of Defendants' behavior constituting the violations alleged above occurred in the State of Illinois and has had a substantial impact of trade or commerce within the State of Illinois.

132. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Members of the Class have suffered and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and Members of the Class and Subclass, requests that this Court:

A. determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. appoint Plaintiff as a representative of the Class and Subclass and his counsel as Class Counsel;

C. declare that Defendants' actions as set forth in this Complaint violate the law;

D. award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. § 1, to be trebled in accordance with those laws;

E. award Plaintiff and the Sub-Class damages in an amount according to proof against Defendants for Defendants' violations of the Illinois Antitrust Act, 740 ILCS 10/1 and for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, to be trebled and/or enhanced in accordance with those laws;

F. award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

G. grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

H. grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

I. declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition except as prescribed by this Court;

J. grant judgment against Defendants and in favor of Plaintiff and each Member of the Class he represents, for restitution as allowed by law and equity as determined to have been sustained by him;

K. declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

L. award pre-judgment and post-judgment interest on such monetary relief;

M. award reasonable attorneys' fees and costs; and

N. grant such further relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Date: October 2, 2026

Respectfully Submitted,

**CLARKSON LAW FIRM, P.C.**

*s/ Derek Y. Brandt*
Derek Y. Brandt
dbrandt@clarksonlawfirm.com
875 North Michigan Avenue, 31st Floor
Chicago, Illinois 60611
Telephone: (312) 300-6820

Larkin Turner*
lturner@clarksonlawfirm.com
1050 Connecticut Avenue NW Ste 500
Washington, D.C. 20036
Telephone: (202) 600-7236
* Application *Pro Hac Vice* to be submitted

*Attorneys for Individual and Representative Plaintiff and the Proposed Class*